1  Lionel Z. Glancy (#134180)
   Michael Goldberg (#188669)
2  Robert V. Prongay (#270796)
   **GLANCY BINKOW & GOLDBERG LLP**
3  1925 Century Park East, Suite 2100
   Los Angeles, CA 90067
4  Telephone: (310) 201-9150
   Facsimile: (310) 201-9160
5  Email: info@glancylaw.com

6  Christopher J. Keller
   Michael W. Stocker
7  Rachel A. Avan
   **LABATON SUCHAROW LLP**
8  140 Broadway
   New York, New York 10005
9  Telephone: (212) 907-0700
   Facsimile: (212) 818-0477

10
   *Counsel for Plaintiff Shaun McCracken*
11

12          UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
13

14  SHAUN MCCRACKEN, Individually and      Case No. SACV13-1463-JST
15  On Behalf of All Others Similarly Situated,      (RNBx)

16                                          CLASS ACTION
                        Plaintiff,
17                                          **COMPLAINT FOR**
                                            **VIOLATIONS OF THE**
18          vs.                             **FEDERAL SECURITIES**
                                            **LAWS**
19  EDWARDS LIFESCIENCES CORP.,
20  MICHAEL A. MUSSALLEM, and              JURY TRIAL DEMANDED
    THOMAS M. ABATE,
21
                        Defendants.
22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    Plaintiff Shaun McCracken ("Plaintiff") makes the following allegations
2  based upon the investigation of Plaintiff's counsel, which included a review of
3  U.S. Securities and Exchange Commission ("SEC") filings by Edwards
4  Lifesciences Corporation ("Edwards Lifesciences" or the "Company"), as well as
5  regulatory filings and reports, securities analysts' reports and advisories about the
6  Company, press releases and other public statements issued by the Company, and
7  media reports about the Company.  Plaintiff believes that substantial additional
8  evidentiary support will exist for the allegations set forth herein after a reasonable
9  opportunity for discovery.

10                    **NATURE OF THE ACTION**

11    1.    This is a federal securities fraud class action brought on behalf of
12  purchasers of the common stock of Edwards Lifesciences (the "Class") between
13  April 25, 2012 and April 23, 2013, inclusive (the "Class Period"), seeking to
14  pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act")
15  against Edwards Lifesciences and certain of its officers.

16    2.    This action alleges that Defendants made false and misleading
17  statements and concealed material information relating to the prospects, projected
18  sales, and adoption of the Company's Edwards SAPIEN transcatheter aortic heart
19  valve, including the related transfemoral and transapical delivery methods
20  ("SAPIEN"), and related projections of financial performance for the Company's
21  operations.  As a result of Defendants' false and misleading statements and
22  omissions, Edwards Lifesciences' common stock traded at artificially inflated
23  prices during the Class Period.

24    3.    Edwards Lifesciences is a medical device maker that designs and
25  markets, among other things, artificial heart valves for implantation in patients
26  with advanced cardiovascular disease.  The Company offers a range of such
27  valves, including both valves that require traditional open-chest surgery, and its
28

1  newer SAPIEN line of transcatheter heart valves ("THVs"), which may be

2  implanted using a minimally invasive procedure.

3      4.      Edwards Lifesciences designed the SAPIEN valve and the related

4  delivery systems for patients with certain risk factors that make traditional surgery

5  inadvisable.  By 2008, the Company had secured marketing authorization in the

6  European Union and was delivering SAPIEN valves to doctors for implant.

7      5.      On November 2, 2011, Edwards Lifesciences received approval from

8  the U.S. Food and Drug Administration (the "FDA") for the transfemoral delivery

9  method of SAPIEN, the first such device approved for use in the United States.

10  The Company would later receive approval for treatment of a wider array of

11  patients on October 19, 2012.

12      6.      During the launch of SAPIEN in the United States, the Company

13  consistently offered positive assessments of the extent to which U.S. hospitals were

14  adopting SAPIEN.  These statements describing strong enthusiasm in the medical

15  community formed a crucial basis for the Company's projections relating to sales,

16  earnings, and the number of hospitals that Edwards Lifesciences was training to

17  perform SAPIEN implants.

18      7.      On October 8, 2012, Edwards Lifesciences issued a press release

19  announcing weak preliminary financial results for the quarter ended September 30,

20  2012, stating in relevant part, that "transcatheter heart valve sales were below

21  expectations."  Michael A. Mussallem, Chief Executive Officer ("CEO") of

22  Edwards Lifesciences, attributed these surprisingly poor results to austerity

23  measures in Europe, and reimbursement uncertainty and phycians' summer

24  vacations in the United States.

25      8.      Ultimately, on April 23, 2013, the Company disclosed that

26  approximately 20 candidate hospitals had postponed SAPIEN training, that there

27  was substantially no backlog of patients awaiting SAPIEN implants, and that the

28  Company's financial results had been and would likely continue to be weaker than

1    estimates.   In response to this news, Edwards Lifesciences' stock price fell $18.21

2    per share, or 21.99 percent, to close at $64.60 per share on April 24, 2013 on

3    extremely heavy trading volume.

4         9.     The following true facts were known by the Defendants but concealed

5    from Edwards Lifesciences' shareholders during the Class Period: (1) adoption of

6    SAPIEN was weaker than the Company claimed due to concerns among physicians

7    over the risks and complexity of the procedure for implanting the valve;

8    (2) Edwards Lifesciences' outlook for sales and earnings per share ("EPS") was

9    significantly weaker than the optimistic guidance Defendants offered to investors;

10   and (3) as a result, Defendants lacked a reasonable basis for the statements made

11   concerning the Company's operations, forecasts, and outlook.

12        10.    Defendants' false and misleading statements caused Edwards

13   Lifesciences stock to trade as high as $110.79 per share and close as high as

14   $109.75 per share on October 4, 2012.  When the true prospects for SAPIEN were

15   revealed, the price of Edwards Lifesciences' stock fell, declining by more than 41

16   percent from its Class Period high.  These decreases were a result of the artificial

17   inflation caused by Defendants' misleading statements coming out of the price of

18   Edwards Lifesciences' stock.

19                        **JURISDICTION AND VENUE**

20        11.    The claims asserted herein arise under and pursuant to Sections 10(b)

21   and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5

22   promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23        12.    This Court has jurisdiction over the subject matter of this action

24   pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1331 (15 U.S.C. §

25   78a(a)).

26        13.    Venue is proper in this District pursuant to Section 27 of the

27   Exchange Act, 28 U.S.C. § 1391(b), because many of the events and omissions

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    4

1    complained of herein occurred in substantial part in the Central District of

2    California.

3          14.    In connection with the acts alleged in this complaint, Defendants,

4    directly or indirectly, used the means and instrumentalities of interstate commerce,

5    including but not limited to the mails, interstate telephone communications, and the

6    facilities of the national securities markets.

7                                    **PARTIES**

8          15.    Plaintiff Shaun McCracken purchased the publicly-traded common

9    stock of Edwards Lifesciences at artificially inflated prices during the Class Period,

10   as set forth in the accompanying Certification and incorporated by reference

11   herein, and has been damaged thereby.

12         16.    Defendant Edwards Lifesciences is a Delaware corporation with

13   headquarters in Irvine, California.  The Company's stock is listed on the New York

14   Stock Exchange (the "NYSE") under the ticker symbol "EW."

15         17.    Defendant Michael A. Mussallem is, and at all relevant times was, the

16   CEO of Edwards Lifesciences and the Chairman of the Company's board of

17   directors.

18         18.    Defendant Thomas M. Abate ("Abate") is, and at all relevant times

19   was, the Corporate Vice President and Chief Financial Officer ("CFO") of

20   Edwards Lifesciences.

21         19.    The Defendants named in paragraphs 17 and 18 are referred to as the

22   "Individual Defendants."

23         20.    During the Class Period, the Individual Defendants, as senior

24   executive officers of Edwards Lifesciences, were privy to confidential and

25   proprietary information concerning Edwards Lifesciences, its operations, finances,

26   financial condition, and present and future business prospects.  The Individual

27   Defendants also had access to material, adverse, non-public information

28   concerning Edwards Lifesciences, as discussed in detail below.  Because of their

1  positions with Edwards Lifesciences, the Individual Defendants had access to non-

2  public information about the Company's business, finances, and future business

3  prospects through access to internal corporate documents, conversations and

4  connections with other corporate officers and employees, attendance at

5  management and/or board of directors meetings and committees thereof, and

6  through reports and other information provided to them in connection therewith.

7  Because of their possession of such information, the Individual Defendants knew,

8  or recklessly disregarded, that the adverse facts specified herein had not been

9  disclosed to, and were being concealed from, the investing public.

10       21.    The Individual Defendants are liable as direct participants in the

11  wrongs complained of herein.  In addition, the Individual Defendants, by reason of

12  their status as senior executive officers and/or directors, were "controlling persons"

13  within the meaning of Section 20(a) of the Exchange Act, and had the power and

14  influence to cause the Company to engage in the unlawful conduct complained of

15  herein.  Because of their positions of control, the Individual Defendants were able

16  to, and did, directly or indirectly, control the conduct of Edwards Lifesciences'

17  business.

18       22.    The Individual Defendants, because of their positions with the

19  Company, controlled and/or possessed the authority to control the contents of

20  Edwards Lifesciences' reports, press releases, and presentations to securities

21  analysts and, through them, to the investing public.  The Individual Defendants

22  were provided with copies of the Company's reports and press releases alleged

23  herein to be misleading, prior to or shortly after their issuance, and had the ability

24  and opportunity to prevent their issuance or cause them to be corrected.  Thus, the

25  Individual Defendants had the opportunity to commit the fraudulent acts alleged

26  herein.

27       23.    As senior executive officers and as controlling persons of a publicly-

28  traded company whose common stock is registered with the SEC, traded on the

1  NYSE, and governed by the federal securities laws, the Individual Defendants had

2  a duty to promptly disseminate accurate and truthful information with respect to

3  Edwards Lifesciences' financial condition and performance, growth, operations,

4  financial statements, business, products, markets, management, earnings, and

5  present and future business prospects, and to correct any previously issued

6  statements that had become materially misleading or untrue so that the market

7  price of Edwards Lifesciences' common stock would be based upon truthful and

8  accurate information.  The Individual Defendants' misrepresentations and

9  omissions during the Class Period violated these specific requirements and

10  obligations.

11  ## FRAUDULENT CONDUCT AND COURSE OF BUSINESS

12         24.    Defendants are liable for: (1) making false statements; or (2) failing to

13  disclose adverse facts known to them about Edwards Lifesciences.  Defendants'

14  deception was a success, as it: (1) misled the investing public regarding Edwards

15  Lifesciences' prospects and business; (2) artificially inflated the prices of Edwards

16  Lifesciences common stock; and (3) caused Plaintiff and other members of the

17  Class to purchase Edwards Lifesciences' common stock at inflated prices.

18  ## SUBSTANTIVE ALLEGATIONS

19  ### Background

20         25.    Edwards Lifesciences designs, manufactures, and markets medical

21  devices to treat heart disease and provide hemodynamic monitoring.  The

22  Company markets its products in the United States and numerous foreign

23  countries.  Edwards Lifesciences' products and technologies for heart valve

24  replacement include surgically implanted replacement valves, which require

25  traditional open-chest surgery, and THVs, which may be implanted through an

26  opening in either the femoral artery or the chest.  THVs are designed to offer a

27  heart valve replacement option for patients who, due to age or other risk factors,

28  are ineligible for or would present a high risk during traditional surgery.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    7

26.     Edwards Lifesciences' SAPIEN THV is an artificial heart valve composed of bovine pericardial tissue surrounded by a polyethylene skirt and an expandable stainless steel frame.  When collapsed, SAPIEN is mounted on a balloon catheter, inserted into the femoral artery or other approved insertion point, and threaded though the artery to the heart, where the balloon and steel frame are expanded.  The balloon is then collapsed and removed, leaving the SAPIEN valve in place.  SAPIEN was the first valve approved for less-invasive implant that can replace the aortic heart valve, the main valve of the heart.

27.     On November 2, 2011, Edwards Lifesciences received approval from the FDA for the transfemoral delivery method of SAPIEN for the treatment of patients presenting severe symptomatic aortic stenosis who are ineligible for traditional surgery.  This was the first transcatheter device approved for use in the United States.  The Company would later receive approval from the FDA for transapical and transfemoral delivery of SAPIEN for treatment of a broader population of patients who presented high risks for traditional surgery on October 19, 2012.

28.     Sales of SAPIEN and other THV-related equipment represented a major area of growth and net income for Edwards Lifesciences.  For example, for its first quarter of 2013, the Company reported that its THV segment represented more than one-third of all revenue, and that U.S. THV revenue accounted for 17.67 percent of the Company's total revenue.  A November 2, 2011 description of the market opportunity SAPIEN put estimates at doubling the Company's then-current $1.5 billion in revenues.

29.     Because of the additional complexity and risk associated with the SAPIEN THV procedure Edwards Lifesciences requires that a hospital seeking to offer SAPIEN disclose detailed data about it facilities, cardiology procedure volume, case mix, and patient outcomes prior to the Company selling SAPIEN

1   valves to the facility.  Further, Edwards Lifesciences performs an in-person

2   inspection of the candidate hospital's facilities.

3        30.     Upon reaching an agreement to supply a hospital with SAPIEN

4   valves, Edwards Lifesciences requires that a hospital purchase at least eight

5   SAPIEN valves and have operating rooms with certain imaging equipment for use

6   during the THV procedure.  Company-affiliated doctors will then train the

7   hospital's surgeons on the SAPIEN THV procedure, screen patients, and monitor a

8   number of the hospital's early SAPIEN THV procedures.

9        31.     During the Class Period, Edwards Lifesciences reported its sales in

10  three product groups: (1) surgical heart valve therapy, composed of surgical heart

11  valves and cardiac surgery systems; (2) THV; and (3) critical care, composed of

12  critical care and vascular products.  Defendants identified development and

13  profitability of the Company's THV business as one of the most important drivers

14  of revenue growth and profitability for Edwards Lifesciences.

15  **Defendants' False and Misleading Statements Issued During the Class Period**

16       32.     After the markets closed on April 24, 2012, Edwards Lifesciences

17  issued a press release announcing its financial results for the first quarter ended

18  March 31, 2012.  The Company reported net income of $65.1 million, or $0.55 per

19  diluted share, compared to net income of $63.9 million, or $0.53 per diluted share,

20  for the same period in 2011.  In connection with these results, CEO Mussallem

21  stated in part:

22               This quarter was highlighted by an impressive first full
23               quarter of SAPIEN commercialization in the U.S.
                 Maintaining a high level of acute procedural success in
24               this new therapy is our first priority, and we are pleased
                 with the high rate that has been achieved.  Although the
25               near term THV sales outlook has lowered our overall
26               2012 expectations, we remain as optimistic as ever about
                 the long-term growth opportunity represented by
27               transcatheter valves.

28

> As we continue to expand our U.S. introduction, nearly every day we are reminded just how impactful our SAPIEN technology is to patients suffering from severe aortic stenosis.

33. The Company also offered guidance, including: (1) second quarter total sales of $470 million to $500 million; (2) second quarter diluted EPS of between $0.64 and $0.68; and (3) full-year THV sales of between $530 and $600 million.

34. In connection with the earnings release, Edwards Lifesciences hosted a conference call to discuss its results with analysts and investors. As part of his prepared remarks, CEO Mussallem stated in part:

> Turning to transcatheter heart valves, first quarter sales were $122 million, a 67% growth rate over last year, driven by the U.S. launch of SAPIEN, with sales of $41 million. Outside the U.S., underlying sales grew 20%, and were somewhat tempered by market dynamics in Europe and the $2-3 million in 29 mm stocking orders last year. Overall, pricing remains stable.

> Transfemoral systems represented approximately 70% of our global sales, lifted by the U.S. commercial ramp, which is entirely transfemoral.

>         *     *     *

> Turning to the US, we're very pleased to report that the total US sales for our first full quarter of launch was $41 million, which included approximately $7 million of clinical sales. Of the $34 million in commercial sales, reorders, driven by higher than expected procedure volume, drove results, with only about 30% coming from stocking units.

> Since the November launch, we've trained approximately 60 centers. Reimbursement uncertainty has caused some centers to postpone their training and others to delay procedures. However, physician and hospital interest in our SAPIEN program remains very high, and we still

expect to train 150-250 new commercial sites in the first 12 months.

As we have previously stated, maintaining a high level of acute procedural success is our first priority, and continues to drive the pace of our SAPIEN rollout. We are very pleased with the high success rate that has been achieved.

Later, as part of the question-and-answer session, CEO Mussallem participated in the following exchange:

[**Analyst:**] [C]ould you just talk qualitatively about the level of enthusiasm?  Hospitals have to invest $3million to $5 million to build a hybrid cath lab. Could you just talk about qualitatively your level of interest in making that sort of investment?

[**CEO Mussallem:**]   Well, the level of enthusiasm continues to be very high from hospitals. I think it would be an exaggeration to say that every hospital that starts a transcatheter program needs to build a hybrid OR. They don't necessarily have to do that. They could upgrade a cath lab if they can get sufficient air turns and so forth. So there's other ways of getting there more economically. Many hospitals do step up and go for the hybrid, though, Bruce.

CEO Mussallem later stated:

[W]e've got a lot of hospitals that are in the queue.

And there tends to be a little bit of churn early on, as some people were prepared, and others weren't prepared. That's lining out. We certainly have more than enough capacity. We have the ability to ramp that.

And some of this will be driven, by whatever the NCD says as well. So we'll see how it goes. Based on everything we know, we think the 150-250 tends to be real solid.

35.     On this positive news, Edwards Lifesciences' stock price moved sharply higher, increasing $8.51 per share, or 11.61 percent, to close at $81.84 per share on April 25, 2012.

36.     Before the markets opened on May 9, 2012, Edwards Lifesciences filed its quarterly report on Form 10-Q for the quarter ended March 31, 2012, which included the same financial results previously reported in the Company's April 24, 2012 press release.  The Form 10-Q also included a certification by CEO Mussallem, incorporated therein as Exhibit 31.1, which stated:

> I, Michael A. Mussallem, certify that:
>
> 1.  I have reviewed this quarterly report on Form 10-Q of Edwards Lifesciences Corporation;
>
> 2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to

us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    13

The Company's May 9, 2012 Form 10-Q also included a substantially similar certification signed by CFO Abate as Exhibit 31.2.

37.    On May 10, 2012, Edwards Lifesciences held its annual meeting of shareholders.  As part of his remarks, delivered after the close of the markets, CEO Mussallem stated:

> We're investors in the future. We were between 14% and 15% of our sales, would be reinvested in R&D, probably spent $300 million this year. You can see where it goes. It's really focused most on breakthrough technology. Those things that we really think to make a difference.
>
> One of the biggest ones that we have in front of us right now is transcatheter heart valves. This is one that certainly make a difference in 2012, but you know what, we believe this one is going to make a difference for a decade or more. That we are just at the front end of this technology and when you combine a few things, one is that aortic stenosis is a really a deadly disease. The prevalence is out there and they are not alternative other than having your valve replaced. And the fact that this therapy is proving to be effective and it's still improving.
>
> We are having next generations, we have a lot of confidence in that it's going to get better, and better and better. And it means that even though we are treating only the oldest and sickest patients today, we believe that this technology ultimately is going to be valuable for more and more patients than ever before. And we'll be able to treat patients that are little healthier maybe have some unique conditions, which today are being treated, and then further although we learned in the treatment of the aortic stenosis, it's going to be flexible to other kinds of structural heart disease, other valve positions within the heart, other kinds of structural conditions that are under served today.

38.    In reaction, Edwards Lifesciences' stock price rose $0.63 per share, or 0.75 percent, to close at $84.68 per share on May 11, 2012.

39.     After the markets closed on July 24, 2012, Edwards Lifesciences issued a press release announcing its financial results for the second quarter ended June 30, 2012.  The Company reported net income of $67.8 million, or $0.57 per diluted share, compared to net income of $58.1 million, or $0.48 per diluted share, for the same period in 2011.  In connection with these results, CEO Mussallem stated in part:

> Even in a challenging economic environment, we reported strong sales growth this quarter driven by the continued success of our U.S. transcatheter heart valve launch.  As the number of U.S. SAPIEN procedures grows rapidly, we are extremely pleased with the continued high success rate being achieved.  During the quarter, we also cleared two significant milestones, the favorable FDA panel evaluating the SAPIEN valve for high-risk surgical patients and the issuance of the final National Coverage Decision defining U.S. reimbursement.

40.     The Company also offered guidance, including: (1) third quarter total sales of $465 to $485 million; (2) third quarter diluted EPS of between $0.57 and $0.61; and (3) full-year THV sales of between $550 and $600 million.

41.     In connection with the earnings release, Edwards Lifesciences hosted a conference call to discuss its results with analysts and investors.  As part of his prepared remarks, CEO Mussallem stated in part:

> Turning to transcatheter heart valves. Second quarter sales were $146 million, 71% growth or 83% underlying growth over last year driven by the US launch of SAPIEN. Transfemoral systems which represent more than 75% of our global THV sales continue to be lifted by the US commercial ramp which is entirely TF and the launch of our 29 millimeter system in Europe.
>
> Outside the US our sales grew 6%. On an underlying basis sales grew 15%, which we estimate was also the approximate growth rate of the market. Continued strong growth in Germany was tempered by negative growth in

Southern Europe and a sharp decline in procedures in the Netherlands.

\*       \*       \*

Turning to the US, we're very pleased to report robust US sales of $61 million for the quarter. Commercial sales were $53 million with about 25% coming from net stocking units which represents stocking sales less consignment. As we broaden consignment net stocking units are expected to contribute less to sales.

Physician interest in our SAPIEN program remains very high and with the final NCD release in May, hospitals now have a better understanding of the requirement for becoming a TAVR center. From launch to the end of the second quarter we have trained more than 110 centers and are confident we'll train 150 to 250 commercial sites by the end of the first year of launch.

During the question-and-answer session of the call, CEO Mussallem engaged in the following exchanges:

[**Analyst 1:**]  And then just walking through the US sites. I think you mentioned it earlier in the prepared remarks. I am sorry I missed it, but how many centers did you say you had up and running as of today. And I think you still reaffirmed the 150 to 250 for the first full-year out?

[**CEO Mussallem:**]  We didn't give an update of where we are today; we gave an update at the end of the second quarter. And we said at the end of the second quarter, we had trained 110 sites since the approval in November. And we said based on that trend we felt very comfortable with the 150 to 250 being trained by the one-year anniversary.

\*       \*       \*

[**Analyst 2:**]  And then you trained 50 centers [in Q2]. Is that roughly the pace we should expect for Q3, Q4?

[**CEO Mussallem:**]   I think so. The one thing that changes there is the fact that when we get the approval

for Cohort A we're going to need to train all the existing centers again. And that is going to be a formal training. We will actually bring people into our training center. It won't take two days like it does today, it is more like a one-day training. But it will consume some of that training capacity. So that's the one thing we wanted to alert you to.

42.     In reaction to these statements, Edwards Lifesciences' stock price rose $6.41 per share, or 6.50 percent, to close at $105.06 per share on July 25, 2012.

43.     Before the markets opened on August 7, 2012, Edwards Lifesciences filed its quarterly report on Form 10-Q for the quarter ended June 30, 2012, which included the same financial results previously reported in the Company's July 24, 2012 press release.  The Form 10-Q also included certifications substantially similar to those described in paragraph 36.

44.     After the markets closed on October 8, 2012, Edwards Lifesciences issued a press release announcing preliminary financial data for the third quarter ended September 30, 2012, stating in relevant part:

> [T]he Company estimates total sales of $448 million for the quarter ended September 30, 2012.  This represents a growth rate of approximately 9 percent, or 14 percent excluding the impact of foreign exchange.   This compares to the Company's guidance of $465 million to $485 million provided during its second quarter earnings conference call on July 24, 2012.   Transcatheter heart valve sales were below expectations for the third quarter, with global sales estimated at $124 million, including U.S. sales of $55 million.

In connection with these results, CEO Mussallem sought to attribute the surprisingly poor performance to a variety of factors and reassure investors, stating:

> In Europe, austerity measures tempered procedural volumes, resulting in underlying sales comparable to the same period a year ago.  In the U.S., we are pleased with the overall progress of the launch, with training of

> commercial sites continuing as planned and procedural success rates remaining high. However, under the provisions of the National Coverage Decision (NCD), there was no reimbursement for inoperable patients without femoral access. A clinical protocol that would allow reimbursement for this sizable group of patients was expected earlier; it is now anticipated in the next several weeks. Additionally, due to the requirement that a full Heart Team be present for every procedure, summer vacations had a more pronounced effect.

> Despite the third-quarter sales shortfall, we anticipate a strong rebound in the fourth quarter. The pending FDA approval to expand the indication to treat U.S. high-risk patients with SAPIEN, as well as the recent addition of our larger 29mm valve and a third delivery approach to our clinical trial, will make this therapy available to a considerably broader group of patients. Assuming this FDA approval happens early this quarter, for full-year 2012, we expect to achieve the low end of both our current global THV sales guidance of $550 million to $600 million, and our U.S. THV sales guidance of $240 million to $260 million. We remain enthusiastic about the potential of this transformative technology to improve the lives of many of the patients who suffer from severe aortic stenosis.

45. After the markets closed on October 19, 2012, Edwards Lifesciences issued a press release announcing its final financial results for the third quarter ended September 30, 2012. The Company reported net income of $69.2 million, or $0.58 per diluted share, compared to net income of $51.6 million, or $0.43 per diluted share, for the same period in 2011. In connection with these results, CEO Mussallem stated in part:

> Our 50 percent growth in transcatheter heart valve sales in the quarter was less than we expected. Looking forward, we expect a strong close to the year with today's approval of expanded indications for SAPIEN, now allowing us to serve many more patients.

> In THV, third quarter results were impacted by European austerity, and in the U.S., by temporary reimbursement conditions and pronounced seasonality.

46.     The Company also offered guidance, including: (1) fourth quarter total sales of $490 to $520 million; (2) fourth quarter EPS of between $0.76 and $0.80; and (3) full-year sales at the bottom of the previously announced range of $1.90 to $1.97 billion.

47.     In connection with the earnings release, Edwards Lifesciences hosted a conference call to discuss its results with analysts and investors.  As part of his prepared remarks, CEO Mussallem sought to allay concerns, stating:

> Our 50% growth rate in transcatheter heart valve sales in the quarter was less than we expected. Austerity measures in Europe posed a challenge and this impacted us harder than we expected. By comparison, we view the issues in the US as more temporary in nature. Looking forward, we expect a strong close to the year.
>
> *     *     *
>
> Turning to the US, THV sales were $55 million for the quarter. Clinical sales of $5 million were lower than the $9 million in the second quarter as two nested registries in PARTNER 2 primarily enrolled in Q2. Net stocking units of $8 million were down from $14 million in the second quarter as fewer centers were trained during the summer months and the first commercial accounts began transitioning to consignment. Reorder sales increased 13% versus the second quarter.
>
> *     *     *
>
> While enthusiasm remains high, the structural heart requirements in the NCD have created a hurdle for new centers and they're working to meet these new standards. From launch to the end of the third quarter, we had trained approximately 150 commercial centers. Including the PARTNER sites, a total of 186 centers have been trained as of September 30.

*     *     *

In summary, we anticipate a strong rebound in the fourth quarter, resulting in a full year underlying growth rate of approximately 70%. With the later-than-anticipated approval of cohort A, we now expect full year US THV sales of $230 million to $240 million, which assumes increasing consignment. For the full year we now expect global THV sales of $530 million to $560 million.

During the question-and-answer session that followed, CEO Mussallem and CFO Abate engaged in the following exchange regarding analyst concerns:

[**Analyst:**] One, you talked early on about you increased your sales reserves by $3 million to better reflect current product return patterns. Can you maybe just explain that in terms of what geographies changed your return assumptions on and why are customers returning products?

And then the second thing you said that kind of caught my attention was that the weakness in Europe was related to budget cuts into their fiscal yearends, but most countries are December. A couple of couple of the other countries already had their fiscal years closed. Spain – if I just go through it, Germany, Spain, France were all December, Italy is June 30, UK is March 31. So with all those countries still looking at their fiscal yearends that I mentioned, in December, does Europe get worse in the fourth quarter?

[**CEO Mussallem:**]   So let me answer your second question and I'll let Tom get into the question about the adjustment. No, we don't anticipate things to get worse necessarily in the fourth quarter. The accounts that we think have slowed down or stopped are going to continue to be slowed down or stopped. It's not that it's that variable. And so we sincerely especially saw this in the South, in Italy and Spain, where literally the procedures just stopped. And so that's what we experienced and that's what we expect to continue into the fourth quarter.

And Tom can get into the second question.

[**CFO Abate:**]  Mike, in regard to the reserve adjustment it was strictly Europe. And keep in mind that we're introducing the new technologies, and what we do on a regular basis is just look at the return pattern and so forth and the expiration on product that's anticipated to expire in the future, and we periodically have to adjust that. Now, not always in the same direction. We're hopeful that we'll have systems improvements that will probably bring this back shortly over time. But it's all and managing what's in the field, with the consignment inventory and the various different releases of product.

48.   Before the markets opened on November 7, 2012, Edwards Lifesciences filed its quarterly report on Form 10-Q for the quarter ended September 30, 2012, which included the same financial results previously reported in the Company's October 19, 2012 press release.  The Form 10-Q also included certifications substantially similar to those described in paragraph 36.

49.   After the markets closed on February 4, 2013, Edwards Lifesciences issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2012.  The Company reported net income of $91.1 million, or $0.77 per diluted share, compared to net income of $63.1 million, or $0.53 per diluted share, for the same period in 2011.  In connection with these results, CEO Mussallem stated in part:

Our fourth quarter capped a year of significant progress as we introduced our innovative SAPIEN technology to the U.S. We are very proud that more than 5,000 patients in the U.S. have been treated with our transcatheter valves since launch, and we are aggressively investing to expand the availability of this important therapy.  In spite of a difficult economic environment, underlying  sales were up 16 percent in 2012 driven by a strong finish in each of our product lines.

50.     The Company also offered guidance, including: (1) 2013 total sales of $2.1 to $2.2 billion; (2) 2013 EPS of between $3.21 to $3.31; and (3) first quarter total sales of $505 million to $530 million.

51.     In connection with the earnings release, Edwards Lifesciences hosted a conference call to discuss its results with analysts and investors.  As part of his prepared remarks, CEO Mussallem stated:

> Today, more than 200 sites commercially offer SAPIEN, and we expect to train an additional 200 new sites over the next 2 years. As we train centers, we continue to require a stocking order, yet at the same time, we expect the impact of consignment to grow in existing centers. As a result, in 2013, we anticipate the impact to reported sales from net stocking to trend from positive to a negative. In 2014, we expect reported sales to begin tracking procedures performed.

During the following question-and-answer session, CEO Mussallem engaged in the following exchange:

> **[Analyst 1:]** Let me start with a question on the U.S. launch. $16 million in stocking in Q4. Mike, in the last call, you said you expected a few million dollars in stocking. Am I thinking about this right?
>
> If you had come in, and stocked just a few million dollars, you would have fallen below the [$]230 to [$]240 [million] in your U.S. SAPIEN guidance? Is that fair or am I doing the math right? Maybe you can talk a little bit about the difference in the stocking versus your expectations?
>
> **[CEO Mussallem:]** Yes. The stocking clearly was more than we expected, Larry. I think we thought it was going to be a lower number. So, you're right. There is a real impact here. The $16 million of stocking lifted us, but I think you need to look at a little bit of a broader picture here.
>
> There was such a rush for--to be trained on transapical that we trained an awful lot of accounts, more than we

expected to train in the quarter. And with that came the stocking orders. At the same time, there was a pretty tremendous queue of transapical patients that had been collected by hospitals.

\* \* \*

[**Analyst 2:**]  [A]s you think about the first quarter for 2013, U.S. SAPIEN sales, do we get another $14 million or $16 million in stocking or will that trend a little bit lower? And then how should we be thinking about the overall U.S. SAPIEN sales for the first quarter? Should we be thinking $90 million to $100 million? And then I have a follow-up.

[**CEO Mussallem:**]  Okay. Well, first of all, it probably wouldn't be surprising to see clinical sales be similar but probably stocking is going to be a little bit less. We'll still have stocking, but it will be certainly be helpful if - it will be the biggest positive of the year will come in the first quarter. I'm not sure that we have a first quarter estimate.

\* \* \*

[**Analyst 3:**]  The TA training number in the U.S. I think you noted there was 150 centers that were TA trained. I think you commented in the past that there was a stocking requirement of 8 valves for every center that got trained on the TA approach and understanding there were some of those that were partner sites, you would still suggest a stocking number that would be even above the number you guys did in the quarter. I understand also there's some consignment offsetting that. Was there some mistake in that calculation in terms of what the requirements were for TA trained sites?

[**CEO Mussallem:**]  No, Raj. You're circling around it pretty well. The bulk of that $16 million of stocking was probably really net that resulted in transapical. And as you're right, transapical probably got pulled down a little bit by some consignment and the transfemoral in the quarter, although it got a lift from stocking, also we had

the beginning of some significant movement to consignment as well. So the bulk of that $16 million is really transapical stocking, but as you correctly point out, consignment does detract from that.

[**CFO Abate:**] Raj, if you're working with the math, you also have to remember, one of the things we said is that some of the larger centers came in for TA, that if they were close to earning consignment, that we probably would not go through with the second stocking order that they would go straight into consignment. So it's smaller than you would think, if you try to match that up to the number of centers. It's quite a bit less. And that's a big piece of the story, quite a few of those guys that came in first. We did not book a stocking order.

52.     Before the markets opened on February 28, 2013, Edwards Lifesciences filed its Annual Report on Form 10-K for 2012, which included the same financial results previously reported in the Company's February 4, 2013 press release.  The Form 10-K also included certifications substantially similar to those described in paragraph 36.

### The Truth Is Revealed

53.     After the markets closed on April 23, 2013, Edwards Lifesciences issued a press release announcing financial data for the first quarter ended March 31, 2013.  The Company reported net income of $144.9 million, or $1.24 per diluted share, compared to net income of $65.1 million, or $0.55 per diluted share, for the same period in 2012.   In connection with these results, CEO Mussallem stated in part:

The ongoing adoption in the U.S. drove global transcatheter valve growth of 40 percent.  Our THV clinical results continue to be very positive and we are making good progress on our pipeline of new products that we believe will enable us to strengthen our leadership position.  Yet, as global sales this quarter across product lines were below our expectations, we are

lowering our 2013 guidance primarily to reflect a slower
start to the year and an updated foreign exchange impact.

54.   The Company also offered reduced guidance for 2013, including:
(1) second quarter total sales of $500 million to $530 million; (2) second quarter
EPS of between $0.75 and $0.79; and (3) full-year sales of $2.0 to $2.1 billion.

55.   In connection with this earnings release, Edwards Lifesciences hosted
a conference call to discuss its results with analysts and investors.  As part of his
prepared remarks, CEO Mussallem stated:

> In Transcatheter Heart Valves, first quarter sales of $170
> million were driven by the ongoing US launch of
> SAPIEN. In the U.S., THV sales were $83 million for the
> quarter, which included clinical sales of $7 million and
> net stocking sales of $6 million. Stocking orders were
> less than expected as we trained fewer TA sites than
> anticipated. While we estimated procedures nearly tripled
> from a year ago and were 20% high year than the fourth
> quarter, they were below our expectations.
>
> Today, more than 225 sites in the U.S. offer SAPIEN to
> their patients. Of these sites, 180 have been trained on a
> transapical approach. While interest among heart teams
> for this important delivery option remains high,
> approximately 20 sites have postponed their TA training.
> We believe the backlog of TA patients who are awaiting
> therapy has now been addressed.
>
> *     *     *
>
> In summary, US THV sales are below our expectations,
> which we believe is primarily the result of evolving
> economics for some hospitals and still-developing
> capacity of both hospitals and their heart teams. As a
> result, we're lowering our 2013 guidance primarily to
> reflect our first quarter experience. We now expect global
> 2013 transcatheter heart valve sales to grow 25% to 30%
> on an underlying basis. This would result in sales of $670
> million to $750 million, which includes $350 million to
> $400 million of sales in the U.S.

During the question-and-answer portion of the call, CEO Mussallem engaged in the following exchange:

> [Analyst:]   I was a little bit surprised to hear the commentary regarding 20 sites canceling their TA training. My initial read on the net stocking numbers, that you might have been transitioning to consignment faster, but it sounds like the dynamic is that you blew through the bolus of patients in TA and now sort of taking a little bit longer to get sites up and running. Is there any more detail you can provide us on why these sites are canceling and what you think it's going to take to get them to, A, go through training; and then, B, get up the curve in doing procedures?
>
> **CEO Mussallem:**   Sure, David, let me get into it. On the 20, I don't know that I would say they canceled, but we would say that they postponed.  And we didn't expect 20 sites to postpone.  There were a variety of reasons for why they did.  Some would say, gee, they're waiting for their hybrid OR to be completed.  Some might say that the surgical teams, for one reason or another, weren't ready to be trained.  Some people cited waiting for [transaortic implant route approval] before they actually jumped into it.  So there were a variety of reasons, but those 20 sites would have probably generated something in the neighborhood of $5 million or more of stocking sales, which we did not realize in the quarter.

56.    In reaction to this news, Edwards Lifesciences' stock price fell sharply, closing lower by $18.21 per share, or 21.99 percent, at $64.60 per share on April 24, 2013, on extremely heavy volume.

57.    The following true facts were known by the Defendants but concealed from Edwards Lifesciences' shareholders during the Class Period: (1) adoption of SAPIEN was weaker than forecast due to concerns among physicians over the risks and complexity of the procedure; (2) Edwards Lifesciences' outlook for sales and EPS was significantly weaker than the optimistic guidance offered to

1  investors; and (3) as a result, Defendants lacked a reasonable basis for the

2  statements made concerning the Company's operations, forecasts, and outlook.

3        58.     Defendants' false statements and omissions caused Edwards

4  Lifesciences common stock to trade at artificially inflated prices during the Class

5  Period.  However, as the conditions described above were revealed to the market

6  on April 23, 2013, the Company's share price fell $45.15 per share—or 41.1

7  percent—from its Class Period-high closing price of $109.75 per share on October

8  4, 2012.

9  **SCIENTER**

10        59.     During the Class Period, Defendants had both the motive and

11  opportunity to commit fraud.  They also had actual knowledge of the misleading

12  nature of the statements they made or acted with reckless disregard for the true

13  information known to them at the time for the reasons discussed above.  In so

14  doing, Defendants committed acts, and practiced and participated in a course of

15  business that operated as a fraud or deceit on purchasers of Edwards Lifesciences

16  common stock during the Class Period.

17  **LOSS CAUSATION/ECONOMIC LOSS**

18        60.     During the Class Period, as detailed herein, Defendants made false

19  and misleading statements that artificially inflated the price of Edwards

20  Lifesciences common stock, and operated as fraud or deceit on Class Period

21  purchasers of Edwards Lifesciences common stock by misrepresenting the recent

22  and ongoing decline in the Company's net sales, competitive position, and business

23  prospects.  Later, when Defendants' prior misrepresentations and fraudulent

24  conduct became apparent to the market, the price of Edwards Lifesciences

25  common stock fell precipitously as the prior artificial inflation came out of the

26  price.  As a result of their purchases of Edwards Lifesciences common stock

27  during the Class Period, Plaintiff and other members of the Class suffered

28  economic loss, *i.e.*, damages, under the federal securities laws.

---

## NO SAFE HARBOR

61.    Edwards Lifesciences' verbal "Safe Harbor" warnings that accompanied any oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

62.    Defendants are also liable for any false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false, and the FLS was authorized and/or approved by an executive officer of Edwards Lifesciences who knew that the FLS was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

63.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and other members of the Class purchased Edwards Lifesciences common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

64. At all relevant times, the markets for Edwards Lifesciences stock were efficient for the following reasons, among others:

(a) as a regulated issuer, Edwards Lifesciences filed periodic public reports with the SEC;

(b) Edwards Lifesciences regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c) Edwards Lifesciences common stock was actively traded in an efficient market, namely the NYSE, under the symbol "EW."

65. As a result of the foregoing, the market for Edwards Lifesciences common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Edwards Lifesciences common stock. Under these circumstances, all purchasers of Edwards Lifesciences common stock during the Class Period suffered similar injury through their purchase of Edwards Lifesciences common stock at artificially inflated prices and the presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

66. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of the Class. Excluded from the Class are Defendants, directors, and officers of Edwards Lifesciences, and their families and affiliates.

67. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of July 31, 2013, Edwards Lifesciences had more than 112 million shares of common stock outstanding, owned by thousands of investors.

68.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    whether the price of Edwards Lifesciences common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

69.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

70.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

71.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of § 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

72.    Plaintiff incorporates paragraphs 1 through 71 by reference.

73.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

       (a)     employed devices, schemes, and artifices to defraud;

       (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

       (c)     engaged in acts, practices, and a course of business that operated as fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Edwards Lifesciences common stock during the Class Period.

75.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially-inflated prices for Edwards Lifesciences common stock.  Plaintiff and the Class would not have purchased Edwards Lifesciences common stock at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by Defendants' misleading statements.

76.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Edwards Lifesciences common stock during the Class Period.

## COUNT II

### For Violation of § 20(a) of the Exchange Act
### <u>Against the Individual Defendants</u>

77.     Plaintiff incorporates paragraphs 1 through 76 by reference.

---

78.     The Individual Defendants acted as controlling persons of Edwards Lifesciences within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Edwards Lifesciences, the Individual Defendants had the power and ability to control the actions of Edwards Lifesciences and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  September 18, 2013          **GLANCY BINKOW & GOLDBERG LLP**

By: _____
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  info@glancylaw.com

Christopher J. Keller
Michael W. Stocker
Rachel A. Avan
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Counsel for Plaintiff Shaun McCracken*

### GLANCY BINKOW & GOLDBERG LLP

**SWORN CERTIFICATION OF PLAINTIFF**
**EDWARDS LIFESCIENCES CORP. SECURITIES LITIGATION**

I, _Shaun   McCracken_____, certify that:

[Please Print Your Name]

1.   I have reviewed the Complaint and authorized its filing.

2.   I did not purchase Edwards Lifesciences Corp., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.   My transactions in Edwards Lifesciences Corp. during the Class Period set forth in the Complaint are as follows:

SEE ATTACHED TABLE

5.   I have not served as a representative party on behalf of a class under federal securities laws during the last three years, except for the following:_____

6.   I will not accept any payment for serving as a representative party, except to receive my pro-rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _9/16/2013_

_____

[Please Sign Your Name Above]

**EXHIBIT**

Transactions in Edwards Lifesciences Corporation

October 9, 2012

       Bought 3000 shares at $87.611 per share

       Bought 1500 shares at $88.001 per share

       Sold 2000 shares at $86.5658 per share

       Sold 1500 shares at $87.16 per share

       Sold 1000 shares at $87.07 per share

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Josephine Staton Tucker_____ and the assigned Magistrate Judge is _____Robert N. Block_____ .

The case number on all documents filed with the Court should read as follows:

## SACV13-1463-JST (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____September 18, 2013_____
Date

By _____MDAVIS_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

☐ Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

☑ Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

☐ Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| SHAUN MCCRACKEN, Individually and On Behalf of All Others Similarly Situated, | EDWARDS LIFESCIENCES CORP., MICHAEL A. MUSSALLEM, and THOMAS M. ABATE, |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) |
|---|---|
| Michael Goldberg (SBN 188669), Glancy Binkow & Goldberg LLP 1925 Century Park East, Suite 2100, Los Angeles, CA 90067 Telephone: (310) 201-9150 | |

## II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No ☒ MONEY DEMANDED IN COMPLAINT: $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Private Securities Litigation Reform Act, 15 U.S.C. §§ 78j(b) & 78t(a); and 17 C.F.R. § 240.10b-5
Securities Fraud - Violation of Sections 10(b) and 20(a) of the Securities Exchange Act and Violation of SEC Rule 10b-5

## VII. NATURE OF SUIT (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 152 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☒ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☒ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: SACV13- 1463

CV-71 (09/13)   CIVIL COVER SHEET   Page 1 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | **A PLAINTIFF?** Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?** Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☐ Yes ☒ No | ☐ Los Angeles | ☐ Los Angeles | Western |
| If "no," go to Question C.  If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C:  Location of plaintiffs, defendants, and claims? | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

**C.1.  Is either of the following true?  If so, check the one that applies:**

☒ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2.  Is either of the following true?  If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Southern Division |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ NO ☐ YES

If yes, list case number(s):

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):**          DATE: September 18, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |